IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| MARQUEZ CRENSHAW, | ) | |
| | ) | |
| Petitioner, | ) | NO. 3:09-0710 |
| | ) | JUDGE HAYNES |
| v. | ) | |
| | ) | |
| HARRY STEWARD, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM

Petitioner, Marquez Crenshaw, filed this action under 28 U.S.C. § 2254 seeking a writ of

habeas corpus to set aside his state convictions for one count of especially aggravated robbery,

five counts of especially aggravated kidnapping, and one count of aggravated burglary, for which

he received a sentence of twenty-seven years. Petitioner filed this action in the Western District

of Tennessee, that transferred the action to this Court. In his pro se petition, Petitioner asserted

the following claims: (1) the State used a coerced confession; (2) evidence by an unlawful arrest;

(3) the State violated his privilege against self-incrimination; (4) the State failed to disclose

evidence favorable to Petitioner; (5) Petitioner's conviction violated the Double Jeopardy

Clause; (6) improper grand jury selection; (7) ineffective assistance of counsel; (8) newly-

discovered evidence; and (9) illegally obtained evidence. (Docket Entry No. 1).

After a review of the petition, the Court appointed the Federal Public Defender to

represent Petitioner and amended petitions were filed.[1] The second amended petition filed by

---

[1] The Federal Rules of Civil Procedure can apply in a habeas proceeding. Mayle v. Felix,
545 U.S. 644, 649 (2005); Rule 6(a), Rules Governing Section 2254 Cases. Under Fed. R. Civ.
P. 15(a), the filing of an amended complaint supersedes the prior complaint. Clark v. Tarrant

counsel presents the following claims under the Fifth, Sixth, Eighth, and Fourteenth

Amendments to the United States Constitution:

(1)     that Petitioner's right to due process was violated by the State's pressuring[2] Mario Mitchell to testify falsely;

(2)     that Petitioner's right to due process was violated by the State's failure to disclose exculpatory or impeachment evidence;

(3)     that Petitioner's Fifth Amendment protection against double jeopardy was violated by his conviction on counts 2 and 3[3] and on counts 1 and 2;

(4)     that Petitioner had ineffective assistance of trial counsel for his alleged failure to object on double jeopardy grounds, failure to investigate and present alibi evidence, and failure to properly discredit Mario Mitchell's testimony;

(5)     that Petitioner's right to due process was violated when the trial court enhanced four of Petitioner's sentences without applying any enhancement factors; and

(6)     that Petitioner is actually innocent of the offense upon which his convictions are based.

---

Cnty., 798 F.2d 736, 740-41 (5th Cir. 1986). The second amended petition adopts and incorporates by reference the claims in the original pro se petition filed in this action, but does not present argument on all of those claims. (Docket Entry No. 37 at 14 n.6). Those claims that are not briefed are deemed waived. United States v. Sandridge, 385 F.3d 1032, 1035 (6th Cir. 2004) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). A party who has counsel cannot generally file separate papers, United States v. Jenkins, No. 03-5055, 229 Fed. Appx. 362, 370 (6th Cir. Dec. 14, 2005), including in habeas actions. Keenan v. Bagley, No. 1:01CV2139, 2010 WL 1133238, at *1 (N.D. Ohio Mar. 19, 2010); Adams v. Schwartz, No. CIV S-05-2237 RRB JFM P, 2008 WL 217514, at *1 (E.D. Cal. Jan. 25, 2008). Thus, the Court considers only claims briefed in the second amended petition filed by counsel.

[2] Petitioner's later briefs characterize this violation as the State allowing Mitchell to testify falsely. (Docket Entry Nos. 54 and 74).

[3] Count 2 states Petitioner "knowingly and unlawfully remove[d] or confine[d] Mario Mitchell so as to interfere substantially with the liberty of Mario Mitchell, and Mario Mitchell suffered serious bodily injury, in violation of Tenn. Code. Ann. § 39-13-305"; Count 3 states he "knowingly and unlawfully remove[d] or confine[d] Mario Mitchell so as to interfere substantially with the liberty of Mario Mitchell, the kidnapping accomplished with a deadly weapon or by the displaying of any article used or fashioned to lead Mario Mitchell to reasonably believe the article to be a deadly weapon, in violation of Tenn. Code Ann. § 39-13-305." (Docket Entry No. 50, Attachment 1 at 6-7).

(Docket Entry No. 37).

In earlier proceedings, the Respondent filed a motion to dismiss (Docket Entry No. 26), but the Court denied the motion without prejudice and concluded that an evidentiary hearing on Respondent's federal limitations defense may be necessary. The parties have since filed documentary evidence, and based on a review of those documents, the Court concludes an evidentiary hearing is unnecessary.

Before the Court are the parties' cross-motions for summary judgment. (Docket Entry Nos. 54 and 71). Petitioner contends that his meritorious Brady and Giglio claims are timely because those claims are based upon newly-discovered evidence under 28 U.S.C. § 2244(d)(1)(D). (Docket Entry Nos. 54 and 74). Respondent asserts that Petitioner's claims are untimely, procedurally defaulted, and without merit. (Docket Entry No. 71).

## A. Procedural History

Petitioner was charged with the aggravated robbery, aggravated kidnapping, and aggravated burglary of Mario Mitchell and his family on November 12, 1998. The jury convicted Petitioner of especially aggravated robbery (Count 1), especially aggravated kidnapping (Counts 2, 3, 4, 5, and 6), and aggravated burglary (Count 7). Petitioner appealed and the Tennessee Court of Criminal Appeals affirmed his conviction and sentence. State v. Baugh, No. M2000-00477-CCA-R3-CD, 2001 WL 589181 (Tenn. Crim. App. June 1, 2001), appeal denied (Tenn. Oct. 1, 2001). The Tennessee Supreme Court denied Petitioner's application for permission to appeal on October 1, 2001. (Docket Entry No. 27, Exhibit F).

Petitioner filed a state post-conviction proceeding on September 24, 2002 and after an evidentiary hearing, the state trial court denied the petition. (Docket Entry No. 27, Ex.I). The Tennessee Court of Criminal Appeals affirmed the trial court's order. Crenshaw v. State, No.

3

M2003-01035-CCA-R3-PC, 2004 WL 550752 (Tenn. Crim. App. Mar. 22, 2004), appeal denied

(Tenn. Aug. 30, 2004). The Tennessee Supreme Court denied Petitioner's application for appeal

on August 30, 2004. (Docket Entry No. 27, Ex.L).

## B. Review of the State Record

On Petitioner's direct appeal, the Tennessee Court of Criminal Appeals made extensive

findings of fact[4] underlying Petitioner's convictions:

> In the early morning hours of November 12, 1998, four masked men broke into
> the north Nashville two-bedroom home of Betty Jean Mitchell. Ms. Mitchell and
> her boyfriend, Michael Pritchard, were asleep in one bedroom, and Ms. Mitchell's
> two sons, eighteen-year-old Mario Mitchell and thirteen-year-old Geno Smith,
> were asleep in the second bedroom, when men shouting "Police! Police!" kicked
> in the front door of their home on Vance Avenue.
>
> The armed, masked men who entered the house were not the police. They bound
> Ms. Mitchell, Michael Pritchard, and Geno Smith with duct tape, and shot Mario
> Mitchell twice in the leg, demanding that he tell them where the money and guns
> were hidden. Ransacking the house, the men found and took approximately $800
> in cash and a nine-millimeter gun belonging to Mario. When they threatened to
> kill him if he did not tell them where the rest of the money was hidden, Mario
> lied, telling them that his cousin was staying at Mario's former residence, a house
> on 12th Avenue, and that they would find his money there. Instead of leaving
> him behind, the men dragged Mario into the hallway, where they shot him again
> in the leg. They then carried him outside to his sport utility vehicle, put him
> inside, and drove him to his former residence.
>
> At the house on 12th Avenue, the men took Mario to the back porch and ordered
> him to yell for his cousin. When the man and woman who were in the apartment
> came out, the men forced either one or both of them back inside at gunpoint,
> ransacked the apartment, and demanded money. Before taking flight, one of the
> men shot Mario once more, grazing his chest with a bullet. While still in the
> emergency room, Mario told police that he had recognized three of the men as
> acquaintances from his neighborhood. Approximately one week later, he
> identified all three defendants from a series of photographic lineups.

---

[4] State appellate court opinion findings constitute factual findings in a habeas action,
Sumner v. Mata, 449 U.S. 539, 546-47 (1981), and have a statutory presumption of correctness.
28 U.S.C. § 2254(e).

4

Baugh, 2001 WL 589181 at *2.

Petitioner's claims focus on Mario Mitchell, the State's main witness, and the Tennessee

Criminal Court of Appeals summarized his testimony as follows:

> **Nineteen-year-old Mario Mitchell**, who said that he was currently in jail
> awaiting trial on drug charges, **testified that he had known all three defendants
> for some period of time prior to the incident of November 12, 1998.** He had
> become acquainted with Baugh and Owes in his north Nashville neighborhood
> during the summer of 1997, **and had known [Petitioner] since 1992 when they
> played in the same baseball league.** On the evening of November 10, 1998, he
> had run into Baugh at a convenience store, where Baugh mentioned to him that
> the 12th Avenue house that [Mitchell] had lived in for about a month in October
> 1998 had just been raided by the police. He saw Baugh again the next evening,
> November 11, when Baugh and Owes stopped to chat with him on the street as he
> waited for his overheated truck to cool down. Owes was wearing black overalls
> and a maroon, hooded sweatshirt, while Baugh was dressed in a silver and black
> "Fubu" jacket and Nike air shoes. After his truck had cooled, he left, telling
> Baugh and Owes that he was going home.
>
> When he got to his mother's house, he lay down on the floor in his brother's
> bedroom and went to sleep to be later awakened by his brother telling him to get
> up because someone was in the house. The next thing he remembered was the
> bedroom door opening, the light coming on, and a masked man coming into the
> room. The man was wearing a dark blue bandana with a white design and the
> "exact" Fubu jacket, Nike air shoes, and sweatshirt that he had earlier seen on
> Baugh. The man shot him above the ankle and demanded money. Mitchell
> testified that when the man spoke, he immediately recognized him as Baugh. He
> said that Baugh has a distinctive, high pitched voice that is easy to recognize.
>
> **Mitchell testified that another man, armed with an automatic gun and
> dressed in a ski mask, dark jeans, and a hooded sweatshirt, came into the
> bedroom to search for money. This man, whom he identified as [Petitioner]
> discovered a nine-millimeter gun that Mitchell had in the house. He said that
> he was able to identify the man as [Petitioner] because he later removed his
> mask, both while still inside the house, as he was searching for money and
> guns, and outside the house, as he drove Mitchell to the 12th Avenue
> residence. Later, Owes came into the bedroom with his mask completely off.
> In addition to recognizing their faces, he also recognized Owes's and
> [Petitioner]'s voices. He said that all the lights in the house were on.**

Mitchell testified that he was shot three times in the left leg while he was in the bedroom, and once in the right leg after he had been dragged into the hallway. Later in his testimony, he stated that it was Baugh who shot him each time. He said that Baugh searched him, finding and taking less than $800 in cash that he had in his pocket. The men also took his nine-millimeter gun. When they threatened to kill him and his family if they did not get more money, he lied, telling them that he had money at his residence on 12th Avenue.

The men bound Mitchell's hands with tape and carried him outside to his Chevrolet Blazer. [Petitioner] and Owes got into the truck with him, while Baugh and the fourth man, whom he could not identify, got into another vehicle. Inside the truck, [Petitioner] and Owes removed their masks again, telling him not to look at them. After struggling for five or ten minutes to uncover the secret to his keyless ignition system, they were able to get the vehicle started, and drove him to the alley behind the 12th Avenue residence. As they waited for the other men to join them, he saw Baugh and the fourth man running through a field toward the truck. During those "five, six, seven" seconds, Baugh was unmasked and Mitchell was able to see his face.

The men pulled him from the truck and dragged him to the back porch of the house, where they made him yell for his cousin. When the man and woman who were staying in the house came out, the man was forced back inside at gunpoint. From the porch, Mitchell could hear the men demanding money and ransacking the apartment. He was unsure of where the woman was during this interval. Baugh and someone else, whom he could not identify, pulled him from the back porch into the utility room. When the other three had left, Baugh stayed behind with him in the utility room, saying, "It's only me and you back here, no witnesses. Tell me where it is now . . . You need to tell me where it is before I kill you." Mitchell said that when he told Baugh that he did not know what he was talking about, Baugh fired his gun at him, grazing his chest, and ran off.

Mitchell testified that he first spoke to police officers at the hospital, where he spent five days in treatment for the four gunshot wounds he had received. Using the nicknames he knew them by, he told detectives that "Boogie" (Baugh), "Damian Jackson" (Owes), and "Monte" ([Petitioner]) had been three of the four men who had attacked him. He admitted that he had used the wrong last name for Owes. In addition to their names, he provided police with a physical description of the defendants. About a week after he was released from the hospital, he identified all three defendants from a series of photographs in a photographic lineup.

Mitchell testified that he was certain that the bandana worn by Baugh had been dark blue and white. He said he had not provided descriptions of the clothing

6

worn by Baugh and Owes in the preliminary hearing because no one had asked that question, and he had been instructed to answer only the questions he was asked. He did not remember if he had initially told police officers if all three defendants had taken their masks off, or if he had only told them that "Monte" had. He insisted, however, that all three, at some point during the episode, had removed their masks. When asked why Pritchard, his mother, and his brother had not seen any of the men unmasked, he explained that it might have been because they were forced to lie with their faces down against the floor. He stated that he had not called any of the defendants by name because he had not wanted them to realize that he recognized who they were.

Mitchell admitted that the police vice squad had raided the 12th Avenue residence two days prior to the incident of November 12th. He claimed, however, that he had already moved out of the house by that time, and denied having ever told anyone that the defendants had "snitched" on him, and that he was blaming them for the instant offenses in order to pay them back. He had identified the three defendants from the very beginning, and had never named the fourth man because he had not recognized him. He denied that the State had offered him any deals in exchange for his testimony in the case.

Id. at *5-7 (emphasis added). Other factual findings, as well as specific testimony, are set forth in the context of Petitioner's specific claims.

### C. Review of the Federal Habeas Record

As evidentiary support for his Brady claims, Petitioner submitted several documents that the State withheld: (1) a six-month lease signed by Mario Mitchell for the 12th Avenue house; (2) Officer Williams' report from the November 10th raid of the 12th Avenue house; (3) the search warrant from the November 10th raid; and (4) the police reports detailing Mitchell's alleged shooting of another person, John Motley. Petitioner asserts that these materials qualify under Brady for disclosure, but were improperly withheld by state prosecutors.

Petitioner also asserts Giglio claims based on the same documents, contending that the State allowed Mario Mitchell to testify falsely when they knew or should have known his testimony was false. Petitioner alleges that Mitchell lied about (1) the expiration of his lease of

the 12th Avenue house; (2) his control of the house on November 10, 1998; (3) his knowledge of the individuals present at the house on November 12, 1998; (4) his knowledge of the individuals present at the house on November 10, 1998; and (5) Petitioner removing his mask during the kidnapping.

### 1. Mario Mitchell's 12th Avenue House Lease and the November 10th Raid

During Petitioner's trial, the State had a lease signed by Mario Mitchell for the 12th Avenue house. (Docket Entry No. 69 at ¶ 82). The six-month lease was from October 2, 1998, through the beginning of April 1999. The rent was $375 per month, and upon signing the lease, Mitchell's mother paid $1100 for the first month's rent, the last month's rent, and a security deposit. Id. at ¶ 3. Petitioner asserts that this rent payment gave Mitchell the right to occupy the house through at least December 2, 1998. (Docket Entry No. 54 at 2). During trial, Mitchell testified that he was not leasing the 12th Avenue house during November 1998. Id. at 6. On cross-examination, Mitchell testified that he rented the house only for October 1998, that he "moved out October 31st, 1998, Saturday evening"; that he "drove by" this residence, but "never [went] back in the house." (Docket Entry No. 50, Attachment 3 at 86, 94-95, 108) (emphasis added). Petitioner asserts that defense counsel would have used the lease to impeach Mitchell about his ties to this residence. (Docket Entry No. 54 at 15).

Petitioner next asserts that between November 3 and 6, 1998, a confidential informant made a controlled buy of cocaine at the 12th Avenue house from an unnamed man of the same race, and approximately the same height and weight, as Mitchell. Id. at 2. The police officers discovered that the house's electrical service was in Mitchell's name and on November 6, police officers obtained a warrant to search the house for drugs, which was subsequently executed on

8

November 10th and led to Officer Williams' investigative report. Id. Petitioner asserts that

defense counsel would have used the search warrant to impeach Mitchell regarding his control of

the house on the date in question. Id. at 15.

On November 10, 1998, prior to the offenses in question, Officer Williams' report on the

execution of the search warrant for the 12th Avenue house, detailed that the police found two

loaded guns, a substantial amount of cocaine, paraphernalia, and walkie-talkies. Id. at 2. This

report concluded that the 12th Avenue house was a "crack house." Id. Only one individual,

Barbara Starks, was present at the time of the raid. Id. Starks stated that Mitchell was in control

of the house and that Mitchell paid her with cash or crack to clean the house. Id. During this

raid, police officers found Mitchell's lease for the house. Id. Petitioner alleges that defense

counsel would have used this report to impeach Mitchell regarding Mitchell's control of the

house at the time of the November 10th raid. Id. at 15.

Petitioner also cites Mitchell's trial testimony about his lease of the 12th Avenue house

during direct examination by the State prosecution:

> Q: What was [your] conversation [with Defendant Baugh the night of November 10th] about?
>
> A: He mentioned something about–uh–the residence where I was living at and–told me it had been–busted, been raided by the police.
>
> Q: Mr. Baugh told you that that residence had been raided?
>
> A: Yeah.
>
> **Q: You didn't live at that residence at that time?**
>
> **A: No.**
>
> **Q: Cause you had moved out at the end of October?**

9

**A:**     **Correct.**

Q:     Did you know anything about the police raiding that residence at that time?

A:     I knew it once he told me.

Q:     But, before that did you know about it?

A:     Naw.

Q:     Did you know what they were raiding that house for?

A:     Naw; no, sir.

Q:     Did Mr. Baugh tell you what the house had been raided for?

A:     No, sir.

Q:     All right.  And, that happened late on the evening of the 10th?

A:     Correct.

Q:     Did he say when it was that raid took place?

A:     Like earlier that day.

Q:     And, have you since learned that that, in fact, took place?

A:     Yes; yes, sir.

*     *     *

**Q:**     **When you suggested there might be money over on 12th Avenue, you didn't know whether there was or not, you just said that?**

**A:**     **I just said it.**

*     *     *

Q:     . . . What did you hear going on at that time [when the man who answered the 12th Avenue house door was taken in at gunpoint but Mitchell was

still outside]?

A: Demanding money, just demanding money and flipping over things in the house. Really, it wasn't much in the house cause it was an abandoned house.

Q: Okay. Do you know who this girl [who also answered the door] was?

A: No, sir.

Q: Had you ever seen her before?

A: Yes, sir.

Q: Had she lived at that residence at all?

A: Maybe.

Q: During the time that you lived there, did she live there?

A: No, sir.

(Docket Entry 50, Attachment 3 at 13-14, 31, 38-39) (emphasis added).

On cross-examination, Mitchell admitted renting the 12th Avenue house through October 1998, but denied that he resided there at the time of the robbery, kidnapping, and burglary and denied that he knew anyone at the residence on the November 12th, when the police searched that residence.

Q: And, you said that–uh–you [and Mr. Baugh] had talked about–uh– your place being raided? Is that right?

A: It wasn't my place.

Q: What?

A: It wasn't my place.

Q: Wasn't your place?

A:    No, sir.

Q:    You had lived there before though, had you not?

A:    Correct.

Q:    And, you talked about it being raided.

A:    Correct.

Q:    All right.  And, uh–you said that you were not there, though, at that time?

A:    Hadn't been in it for two, three weeks.

Q:    All right.  Did you know who was living there at the time?

A:    No, sir.

Q:    You did not.  You knew nothing about who was involved when the raid went down?

A:    I know now, but, at the time I didn't.

                    *        *        *

Q:    Now, on the 10th, are you saying that you did not know anybody that lived at the place you had formerly lived at when the raid went down?

A:    That's correct.

                    *        *        *

Q:    How do you know [the 12th Avenue house] was abandoned?

A:    Cause I moved out October 31st, 1998, Saturday evening.

Q:    Were these people renting?

A:    Maybe.

Q:    Or, had they bought the house?

A:    Maybe.

Q:    But, you testified it was abandoned?

A:    Cause I had moved out two weeks prior.

Q:    So, you really don't know whether it was abandoned. You just knew that you moved out?

A:    Correct.

\*    \*    \*

**Q:    Now, this house at–uh–12th Avenue that you said under direct examination . . . that you rented? Is that correct?**

**A:    Correct.**

**Q:    How much did you rent the house for, sir?**

**A:    Uh–three seventy-five a month.**

**Q:    And, uh–for how many months?**

**A:    One.**

**Q:    Was that–would that be the month of October?**

**A:    Correct.**

\*    \*    \*

Q:    Now, after November 10th, you–I understand you–you heard about a–uh– some sort of police activity at the residence of 12th Avenue. You testified that you heard about it from Mr. Baugh. Is that correct?

A:    Correct.

Q:    Did you ever return to the residence over on 12th, your–your former residence, after you heard about [the November 10th raid]? Did you ever– did you go back by there?

A:    Drove by, but, never–never go back in the house.

Id. at 73-74, 77, 86, 94-95, 108 (emphasis added).

During Mitchell's cross-examination, the trial court held a bench conference on the prosecutor's relevancy objection to defense counsel's question of whether Mitchell knew who was involved in the November 10th raid. Id. at 73, lines 13-16. The defense counsel explained that he was attempting to show "bias due to the time–point in time that–uh–that this occurred in relation to the offense that's on trial today." Id. lines 18-21. The trial court inquired how Mitchell who was not present, would now know who was involved in the 12th Avenue raid and whether his testimony on this subject would be hearsay. Id. lines 23-25. The colloquy at bench conference, in relevant part, was as follows:

| | |
|---|---|
| **Gen. Holmgren:** | **The reason he knows is because he's charged with offenses based on that raid and the search warrant because another defendant implicated him. And, a lease agreement with his name on it was found at the residence during the search. But, any questions that–** |
| The Court: | He's charged with what? |
| Gen. Holmgren: | He's charged with the possession of drugs with intent to deliver. |
| The Court: | From the search of that 12th Avenue? |
| Gen. Holmgren: | Right, on the 10th. So, any testimony that he gives potentially is based on discovery information that he has and, also, on information that would be hearsay. |
| The Court: | I mean, what is the relevance, Mr. Lane, of who was there? |
| Mr. Lane: | If he knows who was there . . . if he knows, you know, to show what happened two weeks later, his motive for naming (phonic) these individuals. |
| The Court: | I–I'm not following you. |
| **Mr. Lane:** | **If he knows–if he knows the people that lived at this** |

14

> **place that got raided that used to be his home two days before the incident went down that we're here today on, then, I think it may show some relevance–uh–later on to show–uh–the fact that he might be trying to blame these individuals because they may have snitched on him and had his place raided two days before this incident happened.**

Id. at 74-75 (emphasis added). The trial judge allowed defense counsel to question about Mitchell what he had been charged with, whether he had made any deals with the State prosecution, and whether he knew who was present during the search of the 12th Avenue house on November 10, 1998. Id. at 75. The trial judge did not permit inquiries into whether Mitchell knew who was present at the November 10th search. Id.

### b. Mitchell's Affidavit Recanting Mask Testimony

In affidavits by Mitchell and Petitioner's investigator, Mitchell denies some of his earlier testimony. After being shot on November 12, 1998, police officers transported Mitchell to the hospital, and Officer Cleek took Mitchell's statement en route. (Docket Entry No. 37 at 7). Officer Cleek's report reflects that Mitchell told him on the way to the emergency room that Petitioner removed his mask during the kidnapping. Id. Detective Thomas Bowden, who took Mitchell's statement during his treatment in the emergency room, testified that Mitchell did not tell him that any of the defendants removed their masks. Id. at 6. Instead, Mitchell told Bowden that he recognized the defendants, including Petitioner, by their voices because they were acquaintances in his neighborhood. Id. Bowden testified that, typically, a witness will volunteer the information that he saw his assailants' faces. Id.

A few days after the incident, Detective Thomas Arendall interviewed Mitchell and at trial, Detective Arendall testified that Mitchell told him that one of the defendants had removed

15

his mask. Id. Arendall report did not specify which defendant had done so. Id. Petitioner does not assert that the State improperly withheld any of these three statements or reports.

At trial, Mitchell testified that he did not remember telling Officer Cleek that Petitioner removed his mask, and Officer Cleek did not testify at trial. (Docket Entry No. 37 at 7). Neither did Mitchell remember telling Detective Arendall that any of the defendants removed their masks. Id. at 6. Mitchell, however, testified at trial that he saw all three of the defendants whom he identified, when they remove their masks. Id. at 7. Specifically, Mitchell identified Petitioner as removing his mask while they were still at his mother's house. Id. at 8. Mitchell testified that he could also identify Petitioner by his voice. (Docket Entry No. 50, Attachment 3 at 26). Mitchell testified that he had previous conversations with Petitioner and that he was able to recognize his voice: "I just knew it. I just know it when I hear it." Id., Attachment 3 at 26 and Attachment 4 at 8. None of the other victims testified that they saw any of the defendants remove their masks. (Docket Entry No. 37 at 7).

Petitioner's investigator interviewed Mitchell and Mitchell signed an affidavit on February 5, 2010, recanting that he could visually identify Petitioner at the crime. Mitchell's actual statement was as follows:

> 4. **I never saw Marquez Crenshaw take off a mask—or saw his face without a mask—during the robbery and other events of November 12th, 1998, either inside the house or outside of the house. I could not recognize Marquez Crenshaw's face during the incident, because the man never had his mask off.**
>
> *     *     *
>
> 6. **I later thought that Marquez Crenshaw was there, because I knew he "ran with" Leonard Baugh and Damian Owes.**

(Docket Entry No. 23, Ex.1 at ¶¶ 4,6) (emphasis added).

### c. Police Reports from the Motley Shooting

Petitioner next cites police reports of Mitchell's arrest for a shooting. After the November events, on December 1, 1998, Mitchell was arrested for driving a vehicle that was allegedly involved in a recent shooting. (Docket Entry No. 54 at 3). Upon searching the vehicle, the police found crack cocaine and two guns. Id. Although a passenger fled on foot, Mitchell could not flee because of a leg injury. Id. Mitchell denied responsibility for the shooting and identified the passenger as John Motley. Id.

Two months later, Motley was shot in the leg. Id. Motley alleged that Mitchell had shot him while they were arguing inside Mitchell's vehicle on December 1st. Id. Motley further stated that Mitchell was angry with him for denying his presence in the vehicle on December 1st, and that Mitchell shot him, saying, "I am not going to give you a chance to go to c[our]t." Id. Moreover, Motley told the police that he and Mitchell had been the "best of friends." Id. When arrested on February 15, 1999, Mitchell admitted that he pistol whipped Motley. Id. at 4. Petitioner contends that defense counsel would have used these reports about Motley at his trial to impeach Mitchell's character. Id. at 16.

### D. Conclusions of Law

### 1. Statute of Limitations

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides that a person convicted in state court has one year from the time his conviction becomes final on direct appeal to file a federal petition. 28 U.S.C. § 2244(d)(1). The limitations period runs from the latest of:

(A)     The date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)     The date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C)     The date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)     The date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Id.

In Lindh v. Murphy, 521 U.S. 320 (1997), the Supreme Court held that the AEDPA was to be applied prospectively, to begin after April 24, 1996. Where a federal habeas action is stayed pending exhaustion of state court remedies, the federal limitations period is tolled. Palmer v. Carlton, 276 F.3d 777, 781 (6th Cir. 2002). Aside from the "stay and abeyance" rule, the federal limitations period can be equitably tolled under the Court's equitable jurisdiction. Souter v. Jones, 395 F.3d 577, 599-600 (6th Cir. 2005). Because Petitioner's direct appeal was pending after 1996, AEDPA's limitations period applies to his claims.

Respondent argues that all of Petitioner's claim are time-barred by the federal habeas statute of limitations, 28 U.S.C. § 2244(d)(1)-(2). The one-year filing period does not commence until the time for filing a petition for writ of certiorari in the United States Supreme Court expires. Bronaugh v. Ohio, 235 F.3d 280, 283 (6th Cir. 2000). Moreover, "the time during which a properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitations." 28 U.S.C. § 2244(d)(2). "[A]n application for post-conviction relief is 'properly

18

filed' within the meaning of § 2244(d)(2) 'when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, . . . the time limits upon its delivery.'" Vroman v. Brigano, 346 F.3d 598, 603 (6th Cir. 2003) (quoting Artuz v. Bennett, 531 U.S. 4, 8 (2000). "'The [statutory] tolling provision does not, however, 'revive' the limitations period (i.e., restart the clock at zero); it can only serve to pause a clock that has not yet fully run. Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations.'" Vroman, 346 F.3d at 602 (quoting Rashid v. Khulmann, 991 F. Supp. 254, 259 (S.D.N.Y. 1998)).

The Sixth Circuit emphasized that "[t]his court . . . does not function as an additional state appellate court reviewing state-court decisions on state law or procedure." Vroman, 346 F.3d at 604 (quoting Allen v. Morris, 845 F.2d 610, 614 (6th Cir. 1988)). Moreover, federal courts are obligated to accept as valid a state court's interpretation of state law and rules of practice of that state. Vroman, 346 F.3d at 604 (citation omitted).

Here, the Tennessee Court of Criminal Appeals affirmed Petitioner's conviction and sentence on June 1, 2001, State v. Baugh, No. M2000-00477-CCA-R3-CD, 2001 WL 589181 (Tenn. Crim. App. June 1, 2001), appeal denied (Tenn. Oct. 1, 2001). Petitioner's application to appeal to the Tennessee Supreme Court was denied on October 1, 2001. (Docket Entry No. 27, Ex.F). Petitioner did not pursue a writ of certiorari with the United States Supreme Court. Therefore, Petitioner's one-year statute of limitations began to run on December 30, 2001, ninety days after the state court judgment became final. Lawrence v. Florida, 549 U.S. 327, 333 (2007). When Petitioner filed his state petition for post-conviction relief on September 24, 2002, two-hundred and sixty-eight (268) days had expired under the federal habeas statue of limitations.

While his post-conviction petition was reviewed, Petitioner's claims under the federal statute of limitations were tolled.

On March 22, 2004, the Tennessee Court of Criminal Appeals affirmed the trial court's denial of post-conviction relief, Crenshaw v. State, No. M2003-01035-CCA-R3-PC, 2004 WL 550752 (Tenn. Crim. App. Mar. 22, 2004), and on August 30, 2004, the Tennessee Supreme Court denied Petitioner's subsequent application seeking permission to appeal. (Docket Entry No. 27, Ex.L). Thus, on August 30, 2004, Petitioner's statute of limitations for federal habeas corpus relief resumed running Petitioner's federal claims and would have expired on Monday, December 6, 2004.[5] Petitioner filed this action on February 17, 2009, nearly four and a half years after the federal habeas limitations period expired.

Petitioner concedes that his claims based upon double jeopardy and sentence enhancement are time-barred and the Court agrees. Petitioner, however, contends that his Brady and Giglio claims are timely based upon newly-discovered evidence.[6] Petitioner alleges he "did not have the facts supporting [his] Brady and [Giglio] claims until January 2010 (when the district attorney allowed [Petitioner's federal habeas counsel] to access the prosecutor's file, and thereby allowed access to the Brady materials)." (Docket Entry No. 74 at 17). In January 2010, Petitioner's counsel first received the following documents: (1) Mitchell's six-month lease for the 12th Avenue house; (2) Officer Williams' report from the November 10th raid; (3) the search warrant authorizing the raid; and (4) police reports detailing Mitchell's alleged shooting of John

---

[5] Petitioner's limitations period would have expired on Sunday, December 5, 2004, but, in accordance with Fed. R. Civ. P. 6, the last day of the limitations period was Monday, December 6, 2004.

[6] Petitioner appears to assert a claim of his innocence.

20

Motley. Id.

Section 2244(d)(1)(D) provides that, for newly-discovered evidence, the federal habeas statute of limitations begins to run upon "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." "The proper task . . . is to determine when a duly diligent person in petitioner's circumstances would have discovered [the factual predicate behind his new-found evidence]." DiCenzi v. Rose, 452 F.3d 465, 470 (6th Cir. 2006) (citing Wims v. United States, 225 F.3d 186, 190 (2d Cir. 2000)); accord United States v. Clark, 928 F.2d 733, 738 (6th Cir. 1991) cert. denied, 502 U.S. 885 (1991) (holding Brady untimely "when the defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information' or where the evidence is available from another source"). The due diligence test applies, and Petitioner's contentions must be supported by facts. Starns v. Andrews, 524 F.3d 612, 618 (5th Cir. 2008).

Petitioner must act "diligently" to pursue these claims. Miller v. Marr, 141 F.3d 976, 978 (10th Cir. 1998) (internal citations omitted). Section 2244(d)(1)(D)'s due diligence requirement focuses "on the petitioner's responsibility to identify the factual basis for his habeas claim in timely fashion." Earl v. Fabian, 556 F.3d 717, 727 (8th Cir. 2009). Once the factual predicate could have been discovered, due diligence issue is moot and the Petitioner simply has one year to file his federal habeas petition. Id.

The precise issue is the date when, by exercise of due diligence, Petitioner **"could have discovered"** the factual predicate for these Brady and Giglio claims. Humphreys, 238 Fed. Appx. at 139-40; Aron v. United States, 291 F.3d 708, 711 (11th Cir. 2002). But see. Rinaldi v. Gillis, No. 05-2101, 248 Fed. Appx. 371, 380 (3d Cir. Sept. 19, 2007) (limitation period

commence when the petitioner received the alleged Brady material).

In Aron v. United States, 291 F.3d (11th Cir. 2002), the Eleventh Circuit explained the

two-step inquiry for newly-discovered evidence claims:

> The government emphasizes that the one-year limitation period of [§ 2244(d)(1)(D)] begins to run when the facts could have been discovered through the exercise of due diligence, not when they were actually discovered. This is indeed the language of the statute; the beginning of the one-year period is triggered by a date that is not necessarily related to a petitioner's actual efforts or actual discovery of the relevant facts. Of course, if a court finds that a petitioner exercised due diligence, then the one-year limitation period would begin to run on the date the petitioner actually discovered the relevant facts, because the dates of actual and possible discovery would be identical. But if the court finds that the petitioner did not exercise due diligence, the statute does not preclude the possibility that the petitioner's motion could still be timely under [ § 2244 (d)(1)(D)]. For example, if the court concludes that, with the exercise of due diligence, the relevant facts could have been discovered two months earlier than the petitioner (who it finds did not exercise due diligence) actually discovered them, then the motion would still be timely if filed within ten months of the date of actual discovery. Nonetheless, the court should begin the timeliness inquiry under [§ 2244(d)(1)(D)] by determining whether the petitioner exercised due diligence because, as previously noted, if he did so, the limitation period would not begin to run before the date he actually discovered the facts supporting the claim.

Id. at 711 (emphasis in original and footnotes omitted).

Petitioner bears the burden of proving "only 'due,' or reasonable diligence" rather than

"the maximum feasible diligence." DiCenzi 452 F.3d at 470-71 (quoting Granger v. Hurt, No.

02-3088, 90 Fed. Appx. 97, 100 (6th Cir. Jan. 23, 2004)). The Sixth Circuit acknowledges the

"reality of the prison system." Granger, 90 Fed. Appx. at 100. See also Townsend v. Lafler, No.

02-2151, 99 Fed. Appx. 606, 608 (6th Cir. May 14, 2004) (holding claims filed three years after

the limitations period time-barred for failure to show due diligence)). Yet, the Sixth Circuit has

noted that "[a] state could conceivably violate Brady in a way that would be easily discoverable

by a duly diligent petitioner." Willis, 329 Fed. Appx. at 17; accord Walker v. Lewis, No. 2:03-00096, 2009 WL 4827429 (M.D. Tenn. Dec. 14, 2009) (holding the petitioner's Brady claim time-barred). While the State's misrepresentations may hinder a petitioner's due diligent search, the petitioner must be unaware of the basis of his claims, as required by § 2244(d)(1)(D), during the time prior to the running of the limitations period. See Willis, 329 Fed. Appx. at 17; Smith, 381 Fed. Appx. at 552; Starns, 524 F.3d at 619; Spirko v. Mitchell, 368 F.3d 603, 610 (6th Cir. 2004).

As an example of due diligence, Willis v. Jones, No. 07-1766, 329 Fed. Appx. 7, 16-17 (6th Cir. May 15, 2009), the Sixth Circuit held that the petitioner's claim was timely under § 2244(d)(1)(D) because the petitioner lacked any reason to know the factual predicate of his Brady claims, could not have known that the State had withheld Brady material, and was entitled to rely upon the State's representation that such material has not in its possession. In Willis, the Sixth Circuit held that reasonable, due diligence does not require a petitioner to inquire of the State immediately after conviction, if the State had withheld Brady documents during the trial. Id. at 17. Nevertheless, the Court held a petitioner's claims time-barred because the relevant evidence was within his knowledge before the AEDPA limitations period ran on his claims. Id. at 10, n.3, 18. See also Smith v. Bell, No. 05-6653, 381 Fed. Appx. 547, 552 (6th Cir. June 18, 2010).

### a. Petitioner's Brady Claims

Petitioner's proof is that he learned of his Brady claim in January 2010, when the state prosecutor's records were released to Petitioner's counsel. These documents reflect that the

State withheld the following exculpatory documents: (1) Mitchell's six-month lease agreement

for the 12th Avenue house, beginning October 2, 2008, with two-months rent paid; (2) Officer Williams' report from the November 10th raid on the 12th Avenue house, with Barbara Starks's statement that Mitchell paid her to clean the house; (3) the search warrant from the November 10th raid, asserting that it was prompted by a betrayal by someone with Mitchell's trust; and (4) police reports regarding Mitchell's shooting of John Motley. (Docket Entry No. 37 at 16). Petitioner also cites the State's promise, during the trial, to disclose all exculpatory and impeachment evidence. (Docket Entry No. 74 at 10).

### i. Mitchell's 12th Avenue House Lease

Although the State did not provide a copy of Mitchell's lease until January 2010, the transcript of Petitioner's trial reflects that Mitchell's 12th Avenue lease was alluded to several times during Mitchell's testimony. Mitchell testified that he had lived there through October 31, 1998, and his mother paid $375 per month rent. Moreover, during the bench conference, the Prosecutor stated in the presence of defense counsel that the police found Mitchell's lease during the November 10th raid of the house: "And, a lease agreement with his name on it was found at the [12th Avenue] residence during the [November 10th] search." (Docket Entry No. 50, Att. 3 at 74) (emphasis added). Despite the State's failure to produce the lease, Petitioner and his trial counsel were aware of the lease agreement during the bench conference at trial. Petitioner has not asserted he has acted with due diligence to secure the lease for trial before January 2010.

Thus, Petitioner's one-year limitations period began to run when his conviction became final on December 30, 2001, and expired on Monday, December 30, 2002. This claim was asserted more than seven years later. For these reasons, the Court concludes that Petitioner's

Brady claim based upon the 12th Avenue lease is time-barred.

### ii. Officer Williams' Report from the November 10th raid

As to the State's withholding of Officer Williams' report about the November 10th raid, Petitioner asserts that the State did not provide a copy of Officer Williams' report until January 2010. In Petitioner's view, Officer Williams' report reveals a potential defense witness, Barbara Starks, who may have testified to Mitchell's ownership and control over the 12th Avenue house on November 10th.

Yet, both prosecutor and defense counsel at trial referred to the November 10th raid multiple times. Respondent contends that Williams report of the search was a matter of public record available as early as April 8, 1999, when the State submitted discovery in the proceedings brought against Mitchell as a result of the search of the 12th Avenue house. (Docket Entry No. 72 at 17). Although Tennessee's Public Records statute, Tenn. Code. Ann. § 10-7-503(a)(1), makes public "all documents . . . made or received pursuant to law or ordinance or in connection with the transaction of official business by any governmental agency," Rule 16 of the Tennessee Rules of Criminal Procedure excludes records in pending criminal proceedings from § 10-7-503 until the proceeding is closed. Appman v. Worthington, 746 S.W.2d 165, 166-67 (Tenn. 1987). Public access to such records becomes available only after all criminal proceedings, including actions for post-conviction relief and habeas corpus, are final. Waller v. Bryan, 16 S.W.3d 770, 776-77 (Tenn. Ct. App. 1999). The conclusion of Mario Mitchell's charges resulting from the search of the 12th Avenue house had not concluded on April 8, 1999, and the Court cannot discern when Officer Williams' report would have been made public.

Thus, the Court cannot discern when Petitioner knew or could have known of the existence of Barbara Starks and her statements to the police on November 10th. The State has

failed to prove that the state prosecutor disclosed Starks's identity to Petitioner at or before trial, Starks was not called as a trial witness by the State. Thus, Petitioner's <u>Brady</u> claim based on Officer Williams' report is deemed timely due to the State's withholding of a potential defense witness.

### iii. Search Warrant Authorizing the November 10th Raid

Petitioner's next claim involves the State's withholding of the search warrant from the November 10th raid in violation of <u>Brady</u>. Although the search warrant is a public record in Tennessee, access to a law enforcement official's report made in anticipation of litigation is not available until the proceeding has become final on direct and collateral review. <u>Appman</u>, 746 S.W. at 166-67; <u>Waller</u>, 16 S.W. at 776-77. The Court cannot discern when the search warrant would have been publicly available. In any event, although the State did not provide a copy of the search warrant until January 2010, at the bench conference, the State prosecutor disclosed that Mitchell was being "<u>charged with offenses based on [the November 10th] raid and the search warrant because another defendant implicated him.</u>" (Docket Entry No. 50, Attachment 3 at 74, lines 13-15) (emphasis added). Despite the fact that the State should have disclosed the search warrant, Petitioner and his trial counsel could have been aware of the factual predicate supporting this <u>Brady</u> claim during the bench conference at trial.

Petitioner's one-year limitations period began to run when his conviction became final on December 30, 2001, and expired on December 30, 2002. Yet, the filing was made nearly eight years later. Moreover, Petitioner has not asserted he has acted with due diligence to discover this information; he has stated only that he obtained and read the search warrant in January 2010. For these reasons, the Court concludes that Petitioner's <u>Brady</u> claim as to the November 10th

search warrant is time-barred.

### iv. Police Reports from the John Motley Shooting

Petitioner's last document for his Brady claim is the police report on the Motley shooting, that the State did not provide until January 2010. Respondent cites Petitioner's trial counsel's questions to Mitchell on cross-examination about Motley. Yet, defense counsel's question merely asked Mitchell if his vehicle belonged to Motley. That question did not necessarily demonstrate that defense counsel knew or could have known that Mitchell had previously shot Motley or the existence of a police report of the incident.

Yet, as a matter of law, the shooting of John Motley is not material under Brady. See Jamison v. Collins, 291 F.3d 380, 385 (6th Cir. 2002) (materiality required for a Brady claim). The Motley shooting occurred three months after the November raid and kidnapping at issue here. Moreover, this shooting involved an unrelated individual, and Petitioner was not a participant. Thus, this claim is dismissed for immateriality.

### b. Petitioner's Giglio Claims

Petitioner's first Giglio claim is predicated on Mario Mitchell's testimony regarding his lease of the 12th Avenue house and his knowledge of the premises during the month of November 1998.[7] (Docket Entry No. 37 at 14). Petitioner argues that he needed the contents of the lease and Officer Williams' report to know whether Mitchell testified falsely. Petitioner alleges that the State knowingly allowed Mario Mitchell to testify falsely during Petitioner's trial. (Docket Entry No. 37 at 14). Specifically, Petitioner asserts that the State failed to correct

---

[7] Although Petitioner presents his Giglio claims regarding Mitchell's testimony separately, all such claims revolve around the State's knowledge of Mitchell's lease.

Mitchell when he testified: (1) that his lease of the 12th Avenue house expired on October 31, 1998; (2) that the 12th Avenue house was not his place in November 1998; (3) that the persons present in the 12th Avenue house on November 10th could have been new tenants; and (4) that Mitchell lacked personal knowledge about who was present at the house on the November 10th raid. (Docket Entry. No. 54 at 13-14). Petitioner asserts that the State's possession of the lease and Officer Williams' report at the time of Petitioner's trial demonstrates the State knew Mitchell's testimony on these subjects to be false. For the reasons stated earlier, the State prosecutor disclosed the lease agreement during a bench conference at Petitioner's trial. Thus, the Court concludes that Petitioner's Giglio claim based on the lease is time-barred.

As to Barbara Starks, who is identified in Officer Williams' report, the Court cannot discern how Petitioner knew or could have known the existence of the potential defense witness, who may have testified that Mitchell paid her to clean the 12th Avenue house. Yet, Petitioner's Giglio claim based on Officer Williams' report is timely due to the State's withholding a potential defense witness.

Petitioner's final Giglio claim involves Mitchell's testimony that Petitioner removed his mask during the course of the kidnapping. In his February 2010 affidavit, Mitchell recanted his trial testimony that Petitioner removed his mask. Courts view affidavits recanting trial testimony with "extreme suspicion," Byrd v. Collins, 209 F.3d 486, 508 n.16 (6th Cir. 2000) (quoting Spence v. Johnson, 80 F.3d 989, 997) (5th Cir. 1996), especially when submitted on Petitioner's behalf many years after his conviction. Mitchell's affidavit is nearly eight years after Petitioner's conviction became final. Petitioner has not alleged what actions he took to comply with § 2244(d)(1)(D)'s due diligence requirement to obtain this affidavit from a known State

28

witness. The Court concludes that this Giglio claim is also time-barred.

## 2. Exhaustion

Alternatively, Respondent contends that Petitioner has not exhausted his state remedies for his Brady or Giglio claims. Petitioner responds that these claims are based upon newly-discovered evidence to explain why neither were presented to the state courts during prior proceedings.

The pendency of a federal habeas action does not toll the limitations period for the filing of a federal habeas claim. Duncan v. Walker, 533 U.S. 167, 181-82 (2001). As to whether the new claims relate back to Petitioner's original claims under Mayle v. Felix, 545 U.S. 644, 664 (2005), the Court concludes that Petitioner's new Brady and Giglio claims are distinct, based on facts that are not in the original federal habeas petition. These claims also are based upon theories not presented to the state courts.

Petitioner must exhaust all claims in state court before asserting those claims in a federal habeas action. Picard v. Connor, 404 U.S. 270, 275 (1971). A federal habeas petitioner must present claims to the state courts as federal constitutional issues rather than state law issues. Id. The facts and federal legal theory raised in a petition for the federal writ of habeas corpus must have been "fairly presen[ted]" to the state courts. Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam) (citing Picard, 404 U.S. at 275); Anderson v. Harless, 459 U.S. 4, 6 (1982) (per curiam) ("It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made."). A claim supported only by citation to state law is insufficient to present a federal claim, even if the cited state decision restated an analysis of federal law. Anderson, 459 U.S. at 7-8 n.3. The state courts must be

provided "with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon [the petitioner's] constitutional claim." Id. at 6 (citing Picard, 404 U.S. at 276-77).

Petitioner's claims under Tenn. Code Ann. § 40-30-102(a) have a one-year statute of limitations bar that makes it clear there is no viable state remedy for Petitioner to exhaust. Petitioner's conviction became final on December 30, 2009, and his limitations period ran for two-hundred and sixty-eight (268) days before he filed a petition for post-conviction relief. If Petitioner were to present his claims in state court, he would be barred by the one-year limitations period under Tenn. Code Ann. § 40-30-102(a). Given the Respondent's motion, Petitioner's Brady and Giglio claims must be evaluated under the Procedural Default Doctrine.

### 3. Procedural Default

Respondent argues that Petitioner forfeited his right to federal habeas corpus review because he procedurally defaulted his Brady and Giglio claims by his failure to present these claims to the state courts. Petitioner contends that cause and prejudice will excuse any procedural default.

The Procedural Default Doctrine bars consideration of a federal claim in a habeas action that was not presented to the state court or was decided on state law grounds.

> [T]his Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment. This rule applies whether the state law ground is substantive or procedural. In the context of direct review of a state court judgment, the independent and adequate state ground doctrine is jurisdictional. Because this Court has no power to review a state law determination that is sufficient to support the judgment, resolution of any independent federal ground for the decision could not affect the judgment and would, therefore, be advisory.
>
> . . . The doctrine applies also to bar federal habeas when a state court declined to

> address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on independent and adequate state procedural grounds.

Coleman v. Thompson, 501 U.S. 722, 729-30 (1991) (emphasis added and citations omitted).

Yet there is a presumption of no procedural default if the state court decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of [the] state law ground is not clear from the face of the opinion . . . ." Id. at 733 (quoting Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)). Further, this doctrine applies only to "firmly established" and "regularly followed" state procedural rules. Ford v. Georgia, 498 U.S. 411, 423-24 (1991).

The Sixth Circuit set out the standard analysis for procedural default in Maupin v. Smith:

> When a state argues that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the federal court must go through a complicated analysis. First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule . . . .
>
>            *    *    *
>
> Second, the court must decide whether the state courts actually enforced the state procedural sanction . . . .
>
>            *    *    *
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims . . . .

785 F.2d 135, 138 (6th Cir. 1986) (citations and footnote omitted).

### a. Noncompliance with Applicable State Rules

Here, Respondent cites Tenn. Code. Ann. § 40-30-102(a) and (c) that has an expired one-year limitations period, as the state rule with which Petitioner failed to comply. Any reliance on a state rule must be express through support by citation to a state law or court rule and a showing of how the facts of the case violate that rule. Walker v. Engle, 703 F.2d 959, 966 (6th Cir. 1983). Because Petitioner's claims 1 and 2 are unexhausted, the Court must consider whether the state court would bar the claims if presented to them. Engle v. Isaac, 456 U.S. 107, 125 n.28 (1982). The Court concludes that the Tennessee courts would conclude that these claims are time-barred.

### b. "Firmly Established" and "Regularly Followed" State Rules

To qualify for the procedural default rule, the cited state law also must be a firmly established and regularly followed state practice. Ford, 498 U.S. at 423-24. In Hutchison v. Bell, 303 F.3d 720 (6th Cir. 2002), the Sixth Circuit analyzed Tennessee's statute of limitations statute on post-conviction petitions and the Burford exception in a procedural default analysis:

> Hutchison argues that Tennessee courts' willingness to excuse procedural default pursuant to Burford demonstrates that state procedural rules are not regularly followed in the context of later-arising claims. . . .

> Nevertheless, we agree that Tennessee's due process exception does not render this provision inadequate. Tennessee's due process exception does not grant unfettered discretion to state courts in applying procedural default rules. Although Tennessee courts will often permit the hearing of an untimely claim, the decision is confined by the due process standards delineated in Burford and its progeny. The Tennessee courts consistently enforce a procedural scheme that encompasses both the one-year limitations period and a court-recognized procedure of tolling that statute when specific due process grounds are presented. . . .

> . . . In Hannah v. Conley, 49 F.3d 1193 (6th Cir. 1995) (per curiam), this Court found that the then-applicable three-year statute of limitations for postconviction

petitions in Tennessee was regularly applied and would bar presentation of an unexhausted claim. Id. at 1197. The Hannah court noted that the language of the statute was mandatory in that it provided that a claimant "must" petition within three years or his claim "shall" be barred. Id. at 1196. The current one-year statute of limitations contains the same mandatory language. See Tenn. Code Ann. § 40-30-202(a).

Although the previous cases did not present a Burford-type later arising claim, we do not find that the state's Burford tolling rules command a different result. . . .

Given that tolling under Burford is not discretionary and given this Circuit's reluctance to discourage state courts from exhibiting caution before applying procedural default rules in capital cases, we conclude that the Burford exception does not render Tennessee's procedural rules inadequate.

Id. at 738-39 (footnotes and some citations omitted).

The Sixth Circuit also ruled in Hutchinson that Burford was not a separate constitutional claim. Id. at 740-41. In other words, Hutchinson found the Tennessee limitations rule to constitute a firmly established and regularly followed state law. Analyzing this case, the Court concludes that Tennessee's limitations statute is an independent and regularly-enforced state rule.

### c. Adequacy of the State Rule

Procedural rules such as statutes of limitations have been found to be independent and adequate. In Coleman, the Supreme Court upheld a procedural rule that bars consideration of a federal claim for failure to meet state law requirements for timely appeals. 501 U.S. 722, 750-51 (1991). In Coleman, the Supreme Court recognized the following state interests as constituting adequate grounds for state procedural rules:

[T]he possible avoidance of an unnecessary trial or of a retrial, the difficulty of making factual determinations concerning grand juries long after the indictment has been handed down and the grand jury disbanded, the potential disruption to the numerous convictions of finding a defect in a grand jury only after the jury

33

has handed down indictments in many cases. . . [.]

Coleman, 501 U.S. at 745-46 (citation omitted).

In Francis v. Henderson, 425 U.S. 536 (1976), the Supreme Court enforced a state rule

that promoted finality, noting a comparable federal rule.

> Plainly the interest in finality is the same with regard to both federal and state
> prisoners. . . There is no reason to . . . give greater preclusive effect to procedural
> default by federal defendants than to similar defaults by state defendants. To hold
> otherwise would reflect an anomalous and erroneous view of federal-state
> relations.

Id. at 542 (internal citation omitted). Accordingly, the Court concludes that Tennessee's statutes

of limitations are adequate for procedural default purposes and are regularly enforced.

### d. Cause and Prejudice

Petitioner must establish cause and prejudice to excuse his procedural default. The

"cause" for the default must be external to the petitioner and must otherwise be attributable to the

state.

> . . . [W]e think that the existence of cause for a procedural default must ordinarily
> turn on whether the prisoner can show that some objective factor external to the
> defense impeded counsel's efforts to comply with the State's procedural rule.
> Without attempting an exhaustive catalog of such objective impediments to
> compliance with a procedural rule, we note that a showing that the factual or legal
> basis for a claim was not reasonably available to counsel, see Reed v. Ross, 468
> U.S. 1, 16 (1984), or that 'some interference by officials,' Brown v. Allen, 344
> U.S. 443, 486 (1953), made compliance impracticable, would constitute cause
> under this standard.

Murray v. Carrier, 477 U.S. 478, 488 (1986) (emphasis added). "Prejudice . . . requires a

showing that the default of the claim not merely created a possibility of prejudice to the

defendant, but that it worked to his actual and substantial disadvantage, infecting his entire trial

with errors of constitutional dimensions." Jamison v. Collins, 291 F.3d 380, 388 (6th Cir. 2002)

34

(citing <u>United States v. Frady</u>, 456 U.S. 152, 170-71 (1982)). Petitioner has cited newly-discovered evidence for his <u>Brady</u> and <u>Giglio</u> claims to establish cause and prejudice for his procedural default.

Under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the government is required to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. A <u>Brady</u> violation can qualify as cause and prejudice to excuse a procedural default. <u>Banks v. Dretke</u>, 540 U.S. 668, 691 (2004) (citing <u>Strickler v. Greene</u>, 527 U.S. 263, 282 (1999)). In <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985), the Supreme Court extended <u>Brady</u> to impeachment evidence. In <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995), the Supreme Court reiterated that <u>Brady</u> materials require disclosure of exculpatory and impeachment evidence, without a request from a defendant.

> [In <u>Bagley</u>], the Court disavowed any difference between exculpatory and impeachment evidence for <u>Brady</u> purposes, and it abandoned the distinction between the second and third <u>Agurs</u> circumstances, <u>i.e.</u>, the 'specific-request' and 'general- or no-request' situations. <u>Bagley</u> held that regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'

<u>Id.</u> at 433 (quoting <u>Bagley</u>, 473 U.S. at 682, 685).

Later, the Supreme Court restated the elements of a <u>Brady</u> violation. "There are three components of a true <u>Brady</u> violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Strickler</u>, 527 U.S. at 281-82. In sum, for his <u>Brady</u> claim, Petitioner must demonstrate: "(1) that

the evidence was favorable to him, (2) that it was suppressed (whether intentionally or not) by the government, and (3) that prejudice ensued." Jamison, 291 F.3d at 385.

Brady's disclosure duty extends to exculpatory and impeachment evidence that is known by the prosecution team and by investigating agents or officers assigned to the team. As the Supreme Court stated in Kyles:

> The State of Louisiana would prefer an even more lenient rule. It pleads that some of the favorable evidence in issue here was not disclosed even to the prosecutor until after trial . . . and it suggested below that it should not be held accountable under Bagley and Brady for evidence known only to police investigators and not to the prosecutor. [FN]
>
> > [FN] The State's counsel retreated from this suggestion at oral argument, conceding that the State is "held to a disclosure standard based on what all State officers at the time knew." Tr. of Oral Arg. 40.
>
> To accommodate the State in this manner would, however, amount to a serious change of course from the Brady line of cases. In the State's favor it may be said that no one doubts that police investigators sometimes fail to inform a prosecutor of all they know. But neither is there any serious doubt that "procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it.' (quoting Giglio v. United States, 405 U.S. 150, 154 (1972)) . . [.]

514 U.S. at 438 (emphasis added).

### i. Trial Evidence of Petitioner's Guilt

As to the materiality of Mitchell's testimony about seeing Petitioner's face on November 12, 1998, the Court first notes the State's other proof of petitioner's guilt. Aside from Mitchell's trial testimony on these issues, the State introduced other evidence of Petitioner's guilt:

(1)   Mitchell's identification of Petitioner by his voice and physical description based upon Mitchell's experiences from the neighborhood and previous conversations

with Petitioner;

(2)  Detective Bowden's testimony that Mitchell identified Petitioner by his voice and described him as being five feet ten, 170 pounds with braided hair and gold teeth;

(3)  Detective Arendall testified that Mitchell identified Petitioner in a photographic lineup;

(4)  Michael Pritchard testimony that he saw a large, black vehicle following Mitchell's vehicle as Petitioner took Mitchell to the 12th Avenue house;

(5)  Hazel Jackson, Petitioner's mother, testified that her 1983 blue Oldsmobile Cutlass was stolen on the night of November 11, 1998, and discovered the next day at Petitioner's grandfather's house, where Mitchell's vehicle was also located. She also testified that the co-defendants were friends of her son.

State v. Baugh, M2000-00477-CCA0R30CD, 2001 WL 589181, at *3-21 (Tenn Crim. App. June 1, 2001), appeal denied (Tenn. Oct. 1, 2001).

### ii. Petitioner's **Brady** Claims

For the reasons stated on due diligence, the Court concludes that the 12th Avenue lease and the search warrant do not establish cause for Petitioner's procedural defaults. From the State prosecution's assertions at trial, Petitioner was aware of the existence of the lease and search warrant. As the prosecution told his counsel: "The reason he knows is because he's charged with offenses based on that raid and the search warrant because another defendant implicated him. And, a lease agreement with his name on it was found at the residence during the search." (Docket Entry No. 50, Attachment 3 at 74-75) (emphasis added).

Likewise, the execution of the search warrant on November 10th was a well established

fact at trial. Failure to undertake a timely inquiry about a disclosed fact is not an "objective

factor external to the defense [that] impeded counsel's efforts to comply the State's procedural

rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). In the Sixth Circuit, a Brady violation is not

shown where the information "lies in a source where a reasonable defendant would have

looked." Spirko v. Mitchell, 368 F.3d 603, 610 (6th Cir. 2004). See also United States v.

Connally, 983 F.2d 1069 (table), 1993 WL 8151, at *7 (6th Cir. Jan. 15, 1993) (holding that the

state did not violate Brady in failing to turn over an indictment of others that would have been

favorable to the defendant because the indictment and prosecution report were public records

which the defendant or his trial counsel could have easily obtained prior to his trial).

Accordingly, the Court concludes that Petitioner cannot demonstrate cause for the lease and the

search warrant. However, if Petitioner could show cause for procedurally defaulting, Petitioner

would still fail to demonstrate prejudice from their non-disclosure.

As to whether the non-disclosure of these two documents as impeachment evidence

satisfy the materiality element under Brady, Kyles cited several factors to be considered:

> Four aspects of materiality under Bagley bear emphasis. Although the
> constitutional duty is triggered by the potential impact of favorable but
> undisclosed evidence, a showing of materiality does not require demonstration by
> a preponderance that disclosure of the suppressed evidence would have resulted
> ultimately in the defendant's acquittal (whether based on the presence of
> reasonable doubt or acceptance of an explanation for the crime that does not
> inculpate the defendant). . . . The question is not whether the defendant would
> more likely than not have received a different verdict with the evidence, but
> whether in its absence he received a fair trial, understood as a trial resulting in a
> verdict worthy of confidence. A "reasonable probability" of a different result is
> accordingly shown when the government's evidentiary suppression "undermines
> confidence in the outcome of the trial." Bagley, 473 U.S. at 678.
>
> The second aspect of Bagley materiality bearing emphasis here is that it is not a
> sufficiency of evidence test. A defendant need not demonstrate that after

discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

Third, . . . once a reviewing court applying Bagley has found constitutional error there is no need for further harmless-error review. Assuming, arguendo, that a harmless-error enquiry were to apply, a Bagley error could not be treated as harmless, since 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,' 473 U.S. at 682 (opinion of Blackmun, J.). . . . In sum, once there has been Bagley error as claimed in this case, it cannot subsequently be found harmless under Brecht.

The fourth and final aspect of Bagley materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item. As Justice Blackmun emphasized in the portion of his opinion written for the Court the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense, 473 U.S. at 675, 105 S.Ct. at 3380 and n.7. We have never held that the Constitution demands an open file policy (however such a policy might work out in practice), and the rule in Bagley (and, hence, in Brady) requires less of the prosecution than the ABA Standards for Criminal Justice, which call generally for prosecutorial disclosures of any evidence tending to exculpate or mitigate. . .

While the definition of Bagley materiality in terms of the cumulative effect of suppression must accordingly be seen as leaving the government with a degree of discretion, it must also be understood as imposing a corresponding burden. On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, see Brady, 373 U.S. at 87, S.Ct. at 1196-97), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

Kyles, 514 U.S. at 434-38 (emphasis added, footnotes omitted, and certain internal citations omitted).

Petitioner fails to demonstrate materiality because the impeaching evidence at issue does not "put the whole case in such a different light as to undermine confidence in the verdict." Strickler v. Greene, 527 U.S. 263, 290 (1999) (quoting Kyles, 514 U.S. at 435). Petitioner has not shown there was a "reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." Strickler, 527 U.S. at 290. In addition to Mitchell's testimony against Petitioner, the State presented circumstantial evidence. Petitioner's mother's vehicle, a blue 1983 Oldsmobile Cutlass, had been discovered at Petitioner's grandfather's house along with Mitchell's vehicle. Michael Pritchard testified that he saw a large, black vehicle following Mitchell's, as the defendants drove from Mitchell's mother's house to the 12th Avenue house. Moreover, Mitchell testified that the defendants drove two vehicles, including his own, to the 12th Avenue house. Also, the jury was aware that Mitchell had pending drug counts.

Moreover, at Petitioner's trial, his counsel cross-examined Mitchell about living in the 12th Avenue house, and Mitchell admitted to residing at that residence until October 31, 1998, prior to the November 10th raid. Moreover, Mitchell testified that to avoid shooting at the residence it was his idea to lead the defendants on November 12 to the 12th Avenue house by lying that his cousin lived there and that he could get money to give to the defendants. Mitchell also testified to being familiar with the woman in the 12th Avenue house on November 12 and called her "April" (Docket Entry No. 50, Attachment 3 at 47). Petitioner contends that Mitchell lied that he was not familiar with a woman present during the raid, id. at 77, but there is

40

person named April Foust listed at the 1706 12th Avenue address who is listed a witness at Petitioner's trial. (Docket Entry No. 50-1at 4). Moreover, the facts are that when Mitchell was confronted by the Petitioner and others, Mitchell was sleeping at his mother's home and there were two other persons living at the 12th Avenue residence. Mitchell took his assailants to the 12th Avenue residence from his mother's residence.

Petitioner relies on Harris v. Lafler, 553 F.3d 1028, 1034 (6th Cir. 2009), holding that a petitioner "suffers prejudice from the withholding of favorable impeachment evidence when the prosecution's case hinges on the testimony of one witness" and where the remaining evidence against the defendant was circumstantial. In Harris, Petitioner demonstrated police statements to a witness to encourage him to alter his testimony. Id. Here, there is not any such proof about the police or prosecutor so encouraging Mitchell. Aside from Mitchell's testimony about Petitioner's face, Mitchell also identified Petitioner by his voice and physical attributes. See Docket Entry No. 50, Attachment 3 at 22, 25-27, 33, 51, 53, 58, 81, 83-84, 92, 101; Att. 4 at 12-13, 16-18, 32.

The Court concludes that Petitioner's cited impeachment evidence, if disclosed at trial and effectively used at trial by his defense counsel, would not "put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 at 435. As the Sixth Circuit recently noted, "[T]he culpability of the state's conduct is not the test under Brady. Rather, [the petitioner] must have been prejudiced by the state's conduct." Apanovitch v. Bobby, No. 09-4333, 2011 WL 2207319, at *7 (6th Cir. June 8, 2011). Because Petitioner cannot show that he is prejudiced by the suppression of Brady material of, all of Petitioner's Brady claims are procedurally defaulted for failure to demonstrate prejudice.

### iii. Petitioner's <u>Giglio</u> Claims

The Supreme Court held that "the knowing use of false testimony to obtain a conviction violates due process regardless of whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when it appeared." <u>Bagley</u>, 473 U.S. at 679 n.8 (explaining <u>Napue v. Illinois</u>, 360 U.S. 264 (1959)); <u>accord</u> <u>Carter v. Mitchell</u>, 443 F.3d 517, 535 (6th Cir. 2006). "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." <u>Napue</u>, 360 U.S. at 269 (reversing conviction where the prosecutor allowed the witness to falsely testify that he was given no consideration in exchange for his testimony). The Court should not, however, "automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to change the verdict.'" <u>Giglio</u>, 405 U.S. at 154.

"To prevail on a false-testimony claim, [Petitioner] must show (1) that the prosecution presented false testimony[,] (2) that the prosecution knew was false, and (3) that was material." <u>Abdus-Samad v. Bell</u>, 420 F.3d 614, 625-26 (6th Cir. 2005) (citing <u>United States v. Hawkins</u>, 969 F.2d 169, 175 (6th Cir. 1992)). The Sixth Circuit has held that a statement must be "indisputably false" rather than "merely misleading," <u>Id.</u> (quoting <u>Byrd v. Collins</u>, 209 F.3d 486, 517-18 (6th Cir. 2000)), and "mere inconsistencies . . . do not establish knowing use of false testimony." <u>Coe v. Bell</u>, 161 F.3d 320, 343 (6th Cir. 1998). Yet, the materiality standard for a <u>Giglio</u> false evidence claim is lower than for a <u>Brady</u> claim. <u>Rosencrantz v. Lafler</u>, 568 F.3d 577, 584 (6th Cir. 2009). When a witness testifies falsely and the prosecution knew or should

have known the testimony was false, the conviction is "set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Id. (citations omitted).

Petitioner alleges that Mitchell lied when he stated: (1) his 12th Avenue house lease expired on October 31, 1998; (2) the 12th Avenue house was not his on November 10th and afterward; (3) to his knowledge, the couple present in the house on November 12th could have been the house's new tenants; and (4) he lacked personal knowledge about who was present in the house when it was raided on November 10th. (Docket Entry No. 54 at 13-14). According to Petitioner, the State should have known this testimony was a false due to Mitchell's lease of the 12th Avenue house and Officer Williams' report from the November 10th raid. Id. Respondent contends that Petitioner has failed to show that these statements were false and, regardless, the judgment of the jury would not have been affected. (Docket Entry No. 72 at 10-13).

A review of the record reflects that Mitchell testified that he moved out on October 31, 1998. (Docket Entry No. 50, Attachment 3 at 86). Mitchell does, however, state that he rented the house and that the 12th Avenue residence was his "place" for only one month. Id. at 72, 94. While in actuality Mitchell's mother paid for two-months' rent, for the first and last month, Mitchell attempted to establish throughout his testimony that he moved out of the house at the end of October. (Docket Entry No. 50 Attachment 3). Mitchell's statements that the house was "not his place" during the month of November may have reflected his view that he did not live there, rather than his view regarding his legal control of the residence. See (Docket Entry No. 50, Attachment 3 at 164-65). Moreover, Mitchell's testimony that the couple present on November 12th could have been new tenants, may not be false. (Docket Entry No. 50,

Attachment 4 at 72-73). Petitioner testified that he had abandoned the residence in October, and on the night of November 10th was at his mother's residence asleep. There was a couple at the 12th Avenue address when Mitchell took Petitioner and other defendants to that location. Regardless, the substance of Mitchell's cross-examination testimony does not reflect that he knowingly testified falsely as to the couple's or his legal status of the house on November 12th, especially considering at the time of the event, Mitchell had just turned eighteen at the time of lease and his mother paid the rent.

To be sure, the lease document reflects Mitchell's right to control access to the 12th Avenue house, but this evidence does not impact Petitioner's participation in the robbery, kidnapping, and burglary. Although Mitchell was the only witness to tie Petitioner directly to the crime, the jury would likely still find Mitchell's identification testimony convincing given his numerous consistent statements that he recognized Petitioner by face, physical description, and voice. Mitchell also explained he had known Petitioner for several years, they lived in the same neighborhood, and were on speaking terms. Even with more effective cross-examination impeaching Mitchell's control over the residence, the Court cannot conclude that the evidence would not have substantially influenced the jury's verdict.

Even if the Court accepts Petitioner's contention that Mitchell's testimony regarding the 12th Avenue house in November was false and that the State should have known these statements to be false, these statements nevertheless fail to establish a "reasonable likelihood" that this false testimony could have affected the judgment of the jury because these documents do not address Petitioner's guilt.

Petitioner's next Giglio claim is that Mitchell lied when he stated that Petitioner had

44

removed his mask during the crime on November 12th. (Docket Entry No. 37 at 15-16).

Petitioner alleges that the State should have known the testimony was false because only one of

three police reports reflects that Petitioner or any of the assailants had removed his mask, and

none of the other victims ever testified that Petitioner removed his mask. (Docket Entry No. 54

at 5). Respondent contends that, even if Mitchell's testimony were false, the State lacked any

knowledge this testimony was false. (Docket Entry No. 72 at 14).

The record reveals that Mitchell's initial statement to the officers was that Petitioner

removed his mask at the residence and en route to the 12th Avenue residence. In his initial

statement in route to emergency care, Mitchell told Detective Cleek that Petitioner had removed

his mask. (Docket Entry No. 37 at 7). In interviews with the other police officers, Mitchell

never denied that Petitioner removed his mask. At trial, when asked about inconsistencies

between his trial testimony and the various police reports, Mitchell repeatedly responded that he

"only answered the questions that [he] was asked." (Docket Entry No. 50, Attachment 4 at 18,

lines 16-17); (Docket Entry No. 50, Attachment 3 at 79, line 21, and at 88, line 1). At trial,

Mitchell testified, "It's been a whole year. There's a lot of things I don't remember and a lot of

things I do remember." (Docket Entry No. 50, Attachment 3 at 84, lines 13-14). Mitchell's

affidavit lacks any explanation for his current statements, and given Mitchell's trial testimony

and more than seven years since the trial, the Court concludes that Mitchell's memory is

unreliable.

Viewing Mitchell's recanting affidavit with "extreme suspicion," Byrd, 209 F.3d at 508

n.16 (quoting Spence, 80 F.3d at 997), the Court concludes that Petitioner has not shown that

Mitchell's testimony about Petitioner's removal of his mask to be false.

### iv. Miscarriage of Justice

To be sure, the procedural defaulted claim can be excused if failure to do so would result in a fundamental miscarriage of justice or would prove his actual innocence of the offense. Sawyer v. Whitley, 505 U.S. 333, 339 (1992). If there were an error-free trial and the actual innocence claim was based upon newly-discovered evidence, then the petitioner's showing of actual innocence must be "extraordinarily high" to show a constitutionally intolerable event, as well as the lack of an available state remedy. Herrera v. Collins, 506 U.S. 390, 417 (1993).

Such claims must be substantive or factual, not procedural, e.g., a claim of innocence based on ineffective assistance of counsel or a prosecutor's failure to disclose Brady material is procedural and subject to the procedural default doctrine. Schlup v. Delo, 513 U.S. 298 (1995). The Court in Schlup explained:

> If there were no question about the fairness of the criminal trial, a Herrera-type claim would have to fail unless the federal habeas court is itself convinced that those new facts unquestionably establish [the petitioner's] innocence. On the other hand, if the habeas court were merely convinced that those new facts raised sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that the trial was untainted by constitutional error, [the petitioner's] threshold showing of innocence would justify a review of the merits of the constitutional claims.

Id. at 317. Where the claim of actual innocence is premised upon a trial with error, then a different and lesser standard of judicial review of sufficient doubt applies.

In Schlup, the Court addressed the standard of proof that a federal petitioner would have to show to establish the actual innocence exception to the procedural default rule in non-capital cases. Id. For cases other than death penalty cases, the Court in Schlup applied the standard in its earlier Carrier decision, stating,

46

[W]e hold that the Carrier "probably resulted" standard rather than the more stringent Sawyer standard must govern the miscarriage of justice inquiry when a petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims.

*   *   *

The Carrier standard requires the habeas petitioner to show that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.' 477 U.S. at 496, 106 S.Ct. at 2649-50. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. The petitioner thus is required to make a stronger showing than that needed to establish prejudice. At the same time, the showing of "more likely than not" imposes a lower burden of proof than the "clear and convincing" standard required under Sawyer. The Carrier standard thus ensures that petitioner's case is truly "extraordinary," McCleskey v. Zant, 499 U.S. 467, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991), while still providing petitioner a meaningful avenue by which to avoid a manifest injustice.

Carrier requires a petitioner to show that he is "actually innocent." As used in Carrier, actual innocence is closely related to the definition set forth by this Court in Sawyer. To satisfy the Carrier gateway standard, a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.

Several observations about this standard are in order. The Carrier standard is intended to focus the inquiry on actual innocence. In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial. Indeed, with respect to this aspect of the Carrier standard, we believe that Judge Friendly's description of the inquiry is appropriate: The habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial."

The consideration in federal habeas proceedings of a broader array of evidence does not modify the essential meaning of "innocence." The Carrier standard reflects the proposition, firmly established in our legal system, that the line between innocence and guilt is drawn with reference to a reasonable doubt. See In re Winship, 397 U.S. 358, 90 S.Ct. 1068 (1970). Indeed, even in Sawyer, with its emphasis on eligibility for the death penalty, the Court did not stray from the understanding that the eligibility determination must be made with reference to reasonable doubt. Thus, whether a court is assessing eligibility for the death penalty under Sawyer, or is deciding whether a petitioner has made the requisite showing of innocence under Carrier, the analysis must incorporate the

understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and innocence.

Id. at 326-28 (footnotes omitted).

Here, Petitioner alleges that he is actually innocent of the offenses, but the Court concludes that Petitioner has not met the actual innocence standard to excuse his procedural defaults by demonstrating his actual innocence. "Recanting affidavits and witnesses are viewed with extreme suspicion by the courts." Byrd, 209 F.3d at 508 n.16 (citation omitted). "Recantation testimony is properly viewed with great suspicion. It upsets society's interest in finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." Dobbert v. Wainwright, 468 U.S. 1231, 1233-34 (1984) (Brennan, J., dissenting from denial of certiorari). Thus,the Court can properly reject the affidavit in which the witness recants his testimony, years after a conviction. Lewis v. Smith, No. 02-2144, 100 Fed. Appx. 351, 355 (6th Cir. Apr. 15, 2004); Carter v. Mitchell, 443 F.3d 517, 539 (6th Cir. 2006) (giving little weight to affidavits put forth in a habeas proceeding because "they merely recant[ed] their trial testimony").

The Tennessee Court of Criminal Appeals summarized and explained the inconsistencies in the evidence against Petitioner:

> In his initial statements to police, including the firm statement given while he was still in the emergency room receiving treatment for his gunshot wounds, Mario Mitchell unequivocally identified "Boogie," "Damian," and "Monte" as three of the men involved. At that time, he provided the physical descriptions of the defendants. Later, he picked their photographs out of a series of photographs shown him by Detective Arendall. He did not identify the fourth man, and consistently told police that he had not recognized that individual.

... He testified [at trial] that he recognized [Petitioner] and Owes by their voices

and clothing, and by seeing their faces when they took off their masks. . . .
Michael Pritchard saw a large black car following Mario's jeep as the men took
Mario from the house. [Petitioner's] mother's blue Cutlass was stolen on the night
of November 11, 1998, and discovered the next day in the backyard of
[Petitioner's] grandfather's house, where Mario's truck was also located.

*     *     *

The defendants argue that Mario Mitchell's identification of them is unreliable,
given the inconsistencies in his testimony. We disagree. Mitchell testified that he
was familiar with all three defendants, that he had regular casual contact with
them in his neighborhood as often as four or five times a week, and that he knew
their voices. Thus, there was evidence from which the jury could determine that
he would have been able, as he testified, to recognize the defendants by their
voices.

State v. Baugh, No. M2000-00477-CCA-R3-CD, 2001 WL 589181, at *10-11 (Tenn. Crim. App.

June 1, 2001), appeal denied (Tenn. Oct. 1, 2001).

Although Mitchell's affidavit recants his facial identification of Petitioner at the scene of

the crime, his affidavit does not recant his trial testimony about hearing Petitioner's voice. At

trial, Mitchell testified to Petitioner's involvement in the crime at least seventeen separate times,

identifying Petitioner not only by removal of his mask but also by his voice and physical

description. Mitchell further testified that identification by voice and physical description would

be possible because he had known Petitioner for several years, they lived in the same

neighborhood, and were on speaking terms. Although State's police reports of the incident, and

the subsequent officers' testimony, varied as to which defendants removed their masks and

where, Mitchell's testimony is consistent with Petitioner's mother's vehicle being found in the

same spot as Mitchell's vehicle. Id. Petitioner's mother owned a 1983 blue Oldsmobile Cutlass,

and Michael Pritchard testified to seeing a large, black vehicle following Mitchell's as the

defendants left for the 12th Avenue house in the middle of the night. Significantly, Mitchell's

trial testimony is consistent with the statement he gave to police immediately after the incident upon being transported to the emergency room. The Court concludes Mitchell's trial testimony and statements during an emergency situation are more credible than his recanting affidavit nearly eight years after Petitioner's conviction. Thus, Mitchell's affidavit does not demonstrate Petitioner's actual innocence of the crime, as Mitchell's identification of Petitioner by voice and physical description stands.

Petitioner's other documents, the 12th Avenue lease and the reports and search warrant from the November 10th raid are even weaker evidence of Petitioner's alleged innocence. Although these documents may have allowed defense counsel to impeach Mitchell on his control of the 12th Avenue house and question Mitchell as to his motive to identify Petitioner, Petitioner's evidence does not speak to his guilt or Mitchell's ability to identify his kidnapper.

Thus, the Court concludes that Petitioner's evidence asserting his actual innocence does not demonstrate that "constitutional error probably resulted in the conviction of one who is actually innocent." Schlup, 513 U.S. at 326 (quoting Carrier, 477 U.S. at 496). Accordingly, Petitioner's motion for summary judgment (Docket Entry No. 54) should be denied and the Respondent's motion for summary judgment (Docket Entry No. 71) should be granted.

For these reasons, the Petitioner's petition (Docket Entry No. 1) and amended petitions (Docket Entry Nos. 23 and 37) for the writ of habeas corpus should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the _____ 28th _____ day of July, 2011.

WILLIAM J. HAYNES, JR.
United States District Judge